IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 17, 2000

## STATE OF TENNESSEE v. CHRISTOPHER KNIGHTON

**Direct Appeal from the Circuit Court for Blount County**
**No. C-11141, 42     D. Kelly Thomas, Jr., Judge**

**No. E2000-00746-CCA-R3-CD**
**February 15, 2001**

The defendant was convicted by a jury of aggravated rape, aggravated burglary and theft. In his direct appeal, he presents six issues for review. Three of those issues concern the jury selection process, one issue is an evidentiary issue, and the other issues concern the sufficiency of the indictment and the sufficiency of the evidence. With respect to the jury selection process, we hold: the failure to raise the issue of a <u>Batson</u> violation during jury selection constitutes a waiver of that issue; the failure to swear the jury before voir dire is not reversible error unless it is shown that a juror did not truthfully answer the questions as the result of not being sworn; and the trial court did not abuse its discretion in refusing to dismiss two jurors for cause. Additionally, we hold that felony drug crimes are crimes involving dishonesty and are relevant to the issue of credibility under Tenn. R. Evid. 609, and that under the facts of this case, the unfair prejudicial effect did not outweigh the probative value of the impeaching convictions. Finally, we hold that the indictment charging the defendant with aggravated rape was legally sufficient, and that the evidence was sufficient to support the verdict of the jury for that offense.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

WILLIAM B. ACREE, JR., SP. J., delivered the opinion of the court, in which DAVID H. WELLES and JOHN EVERETT WILLIAMS, JJ., joined.

Jon A. Anderson, Maryville, Tennessee, for the appellant, Christopher Knighton.

Paul G. Summers, Attorney General and Reporter; Mark A. Fulks, Counsel; Michael L. Flynn, District Attorney General; Kirk Andrews and Edward P. Bailey, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The defendant, convicted of aggravated rape, aggravated burglary, and theft, received an effective sentence of 31 years. He presents six issues for review: (1) the evidence was insufficient to support the verdict of the jury for the conviction of aggravated rape; (2) the voir dire process was

defective because some of the jurors were not sworn before voir dire; (3) the trial court erred in refusing to excuse two jurors for cause; (4) the State intentionally and systematically excluded males from the jury resulting in a trial by twelve women; (5) the indictment charging the defendant with aggravated rape was legally insufficient; and (6) the trial court erred in ruling that the defendant's previous convictions for distributing drugs was admissible for impeachment purposes. The defendant's appeal is properly before this Court.

## Facts

The victim was 27 years old at the time of the crime. She was single and lived alone except that her boyfriend, Stacy Sudderth, sometimes stayed overnight. On the morning of April 6, 1998, she went to work at her regular job at Densco Manufacturing in Maryville, Tennessee.

Seneca Teeter testified that the defendant and Andre Jackson made several telephone calls to her on April 6. The defendant told her they were at the victim's home. Evidence from the telephone company corroborated Ms. Teeter's testimony. According to the telephone company records, six telephone calls were made between the hours of 1:00 p.m. and 5:00 p.m. from the victim's home telephone number to Ms. Teeter.

The presence of someone in the victim's home was corroborated by Patricia Norman, the victim's next door neighbor. She testified that between 2:00 and 2:30 in the afternoon, she saw someone peeking out of the victim's window.

The victim returned home between 5:00 and 5:30 in the afternoon. She went into her bathroom and was confronted by two men. Both were dressed in black, were wearing black ski masks and had gloves on their hands. The defendant was the shorter of the two and had a handgun in his hand. Jackson had a knife in his hand.[1] The victim was forced into the bedroom where the defendant tied her hands with a telephone cord, and Jackson removed her clothes by cutting them. The defendant left the bedroom while Jackson remained and forcibly raped her. When Jackson was over her, he lifted his mask, and the victim could see the bottom part of his face. The man was lighter than her.[2] He had gold in his mouth and facial hair. She also observed that he had on red tennis shoes.[3] Jackson inserted himself into her but stopped when she told him she was hurting. He

---

[1] Through the testimony of a witness and through a stipulation, the State established that the defendant was 5'8", and Jackson was 6'2". The victim could not identify the defendant and Jackson. Their identity and involvement in these crimes was established by direct and circumstantial evidence from several witnesses.

[2] The victim, Jackson, and the defendant are of the black race.

[3] Another witness saw Jackson later in the day and gave the same description.

did not ejaculate inside her. During the process, Jackson told the victim that the rape was not about her, but that it was because her boyfriend, Stacy Sudderth, owed them money.[4]

As they were leaving, the two men took the victim's cell phone and her jewelry. They told her that if she did not have $10,000 by ten o'clock that night, they were going to kill her, her boyfriend, and her family. The men put the victim into a closet and left. After the two men left, the victim was able to telephone a friend, Syreeta Tate.

Ms. Tate and her three-year-old son came to the victim's house and found the victim naked with her hands tied behind her back. Ms. Tate untied the victim and left because she was concerned the two men were still near, and she did not want to endanger her son. After leaving, Ms. Tate located Stacy Sudderth and sent him to the victim's house.

After Ms. Tate left, the victim called her cousin, Offie Blake, who called the police. Several police officers came to the victim's house. One of the officers testified that the victim was hysterical, sobbing and gulping for air. She told him she had been attacked by two men wearing masks who were armed with a pistol and knife. She told him that she had been raped. The officer testified that the house had been ransacked, and the furniture looked like it had been damaged or destroyed. The testimony of the officer concerning the victim's condition and state of mind and the condition of her house was corroborated by the testimony of other police officers and by the victim's boyfriend.

At about 5:30 p.m., Melissa Ann Carter, who lived near the victim, observed two men wearing ski masks run to the porch of the house next door. She observed them remove their ski masks and recognized them to be the defendant and Andre Jackson.

At about the same time, Jackson called his girlfriend, Stephanie Delapp, and asked her to come get them. According to the records of the telephone company, the call was made from the victim's cell phone. As Miss Delapp turned on to the street where Jackson and the defendant were standing, a group of young boys threw a rock at her car. Jackson and the defendant confronted the boys. Syreeta Tate testified to seeing the same confrontation after she left the victim's house. The defendant and Jackson were standing in the street near the victim's home, and the defendant had a gun in his pants.

The victim was carried to the emergency room at the Blount Memorial Hospital. The emergency room physician testified that the victim was distraught, upset, crying and angry. She had linear bruises on her wrists which were consistent with her history of being tied by a telephone cord.

---

[4] This testimony was corroborated in part by Stacy Sudderth who testified he had previously had words with the defendant.

The examination revealed a clitoral tear which appeared to have occurred within the past two to four hours. The tear was consistent with forceful sex.[5]

Maurice Asbury testified that on the morning of April 6, the defendant told him that he was going to f - - - some girl. Later, Asbury and the defendant picked up Andre Jackson at his house. Late that night, the defendant called Asbury. The telephone records revealed that the call was made from the victim's cell phone.

During the late night of April 6 or the early morning of April 7, Andre Jackson was killed. His death was determined to be a homicide.

Diva Brown, Andre Jackson's mother, testified that a few days after her son was killed, she talked with the defendant. The defendant told her that Stacy Sudderth had sold Andre Jackson and him some bad drugs at a price of about $3000. He said they went to the victim's house to see if they could confiscate something to make up for the money that had been taken from them. The defendant denied that they raped her but admitted they were in her house.

## Analysis

In determining the sufficiency of the convicting evidence, this Court does not reweigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776 (Tenn. Crim. App. 1990); State v. Butler, 900 S.W. 2d 305 (Tenn. Crim. App. 1994). Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all the factual issues raised by the evidence are resolved by the trier of fact, not this Court. State v. Cabbage, 571 S.W.2d 832 (Tenn. 1978). A guilty verdict, approved by the trial judge, credits the testimony of the State's witnesses and resolves all conflicts of testimony in favor of the theory of the State. State v. Hatchett, 560 S.W.2d 627 (Tenn. 1978). Since a verdict of guilty removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the jury. State v. Tuggle, 639 S.W.2d 913 (Tenn. 1982); Butler, 900 S.W.2d at 309. This Court will not disturb a verdict of guilty due to the sufficiency of the evidence unless the facts contained in the record and any inferences which may be drawn from the facts are insufficient, as a matter of law, for a rational trier of fact to find the accused guilty beyond a reasonable doubt. Tuggle, 639 S.W.2d at 914; Butler, 900 S.W.2d at 309.

We find that the evidence was sufficient to convict the defendant of the crime of aggravated rape. Although the victim was unable to identify the defendant, there was ample evidence upon which the jury could find the defendant guilty of this crime. The testimony of the victim that she was raped was uncontradicted and was corroborated by several witnesses including the emergency room physician. She also testified as to the manner in which the rape occurred and was able to offer descriptions to distinguish the two men. The presence of Andre Jackson and the defendant in the

---

[5] A forensic serologist and DNA analyst at the Tennessee Bureau of Investigation testified she was unable to obtain a DNA profile because no semen had been emitted during the rape.

victim's home was established through the testimony of several witnesses and was corroborated by the telephone records, which established that the defendant and Jackson made several calls from the victim's home phone and cell phone. Also of significance was the testimony of Melissa Ann Carter, who observed the defendant and Andre Jackson removing ski masks late in the afternoon of April 6 near the victim's home, and the testimony of Seneca Teeter and Stephanie Delapp, who saw Jackson and the defendant near the victim's home immediately after the rape. We find that this evidence is clearly sufficient to establish that the defendant was present in the home of the victim on the afternoon of April 6, 1998, and that he assisted and aided Andre Jackson in raping the victim.

In the second issue presented for review, the defendant contends that the voir dire process was defective because some of the jurors were not sworn before voir dire.

The record reflects that 24 jurors were initially brought into the courtroom and were sworn before voir dire. It later became necessary to call additional jurors, but the trial court apparently overlooked administering the oath to them. His failure to do so was not brought to his attention by either the State or the defendant, and this issue was not raised until the motion for a new trial. In ruling upon the motion, the trial court stated that all jurors had attended an orientation session before the trial. At that time, they were all sworn and instructed upon the importance of understanding questions asked during the voir dire and answering those questions truthfully. The defendant does not claim any prejudice as the result of failing to swear the additional jurors nor does he claim that any juror did not truthfully answer questions asked upon voir dire.

This Court addressed the same issue in State v. Lillard, No. 03C01-9704-CC-00123 (Tenn. Crim. App., filed December 23, 1997, at Knoxville), and held that although Rule 24 of the Tennessee Rules of Criminal Procedure requires that prospective jurors be sworn to answer truthfully questions they will be asked during the selection process, the failure to do so was harmless error when the defendant made no allegations that the jury was not fair and impartial.

Herein, there is no allegation or evidence that the jury was not fair and impartial or that the defendant was prejudiced by the failure of the trial court to swear all prospective jurors. We find this error to be harmless.

The third issue presented for review is the contention that the trial court erred in refusing to excuse two jurors for cause. One juror had had her house burglarized and was assaulted during the process (juror #18). The other juror read about the case in the newspaper and worked at the same company as the victim (juror #14). The defendant contends that he was required to use peremptory challenges to remove these two jurors which caused him to exhaust his challenges.

There is nothing in the record to suggest that the burglary and assault upon juror #18 caused her to have any bias in favor of the State or that it influenced her in any manner. Likewise, juror #14 said that although he had read a news account of the crime, he remembered little about what he had read, and he had no opinion about the case. He also said that while he worked at the same company

as the victim, he did not know her. There is no evidence which suggests that juror #14 was influenced or biased by what he read in the newspaper or because he worked at the same plant as the victim.

It is well established that the trial court has wide discretion in determining the qualifications of a juror. The trial court's decision will not be overturned unless there is a clear showing of an abuse of discretion. State v. Kilburn, 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989); Burns v. State, 591 S.W.2d 780, 782 (Tenn. Crim. App. 1979). There is no showing of abuse of discretion in the trial court's refusal to excuse these jurors for cause. This issue is without merit.

In his fourth issue presented for review, the defendant alleges the State intentionally and systematically excluded males from the jury. The record reflects that the State exercised seven peremptory challenges and all of them were males. No males sat on the jury. The defendant made no objection to the State's peremptory challenges during the jury selection process and did not raise this issue until the motion for a new trial.

In Batson v. Kentucky, 476 U. S. 79, 106 S. Ct. 1712, 90 L. Ed. 69 (1986), the Supreme Court of the United States held that "the equal protection clause forbids the prosecutor to challenge potential jurors solely on account of their race". In J.E.B. v. Alabama, ex rel. T. B., 114 S. Ct. 1419, 128 L. Ed. 89 (1994), the Supreme Court held that peremptory strikes made solely on the basis of gender also violate the dictates of the equal protection clause. The Supreme Court of Tennessee has addressed this issue in holding that a defendant could not use peremptory strikes to remove all females from the jury venire. State v. Turner, 879 S.W.2d 819, 823 (Tenn. 1994). The procedure for invoking the protection of Batson is well established and recently outlined in State v. Spratt, 31 S.W.3d 587 (Tenn. Crim. App. 2000).

Here the defendant must establish a prima facie case that a juror is being challenged on the basis of gender. See Spratt, 31 S.W.3d at 596. Once the defendant has presented a prima facie case, the trial court shall require the State to give a gender-neutral reason for the challenge. See id. If a gender-neutral explanation is given, the court must then determine whether the defendant has established purposeful discrimination. See id. The court in Spratt outlined the trial court's duties as follows:

> The trial judge must carefully articulate specific reasons for each finding on the record, i.e., whether a prima facie case has been established; whether a neutral explanation has been given; and whether the totality of the circumstances support a finding of purposeful discrimination. The trial court's factual findings are imperative in this context. On appeal, the trial court's findings are to be accorded great deference and not set aside unless clearly erroneous. Thus, specificity in the findings are crucial.

Spratt, 31 S.W.3d at 596 (quoting Woodson v. Porter Brown Limestone Co., Inc., 916 S.W.2d 896, 906 (Tenn. 1996)) (citations omitted).

In this case the defendant did not object to the State's peremptory challenges, and, consequently, did not establish a prima facie case that the jurors were being challenged on the basis of gender. As a result, no gender neutral explanations were offered by the State, and the trial court made no factual findings. The failure of the defendant to timely raise a <u>Batson</u> violation was addressed in <u>State v. Elmore</u>, No. 03C01-9711-CR-00514 (Tenn. Crim. App., filed September 8, 1998, at Knoxville). In <u>Elmore</u>, the Court noted that the remedy for the discriminatory exercise of a peremptory challenge is for the Court to disallow the exclusion of the challenged juror. The Court held that the defendant was not entitled to appellate relief when the defendant failed to raise his objections in time to allow the Court to cure an alleged discrimination.

Based upon the cases cited herein, we hold that the defendant failed to timely raise the issue of a <u>Batson</u> violation and waived that issue.

In his fifth issue presented for review, the defendant insists the indictment charging him with aggravated rape was legally insufficient.

The defendant was indicted for aggravated rape in alternative counts. In Count One, the indictment alleged the defendant forcefully raped the victim while armed with a knife. In Count Two, the indictment alleged that the defendant forcefully raped the victim while aided and abetted by another person. The defendant argues that it was Andre Jackson who had the knife and who actually raped the victim and, consequently, the indictment did not provide sufficient notice to him of the charges being made. On the other hand, the State argues that it was entitled to rely upon the criminal responsibility statute and that the indictment was sufficient.

In <u>State v. Hammonds</u>, 30 S.W.3d 294 (Tenn. 2000), our Supreme Court summarized the constitutional notice requirements of an indictment. The indictment must contain allegations that (1) enable the accused to know the acquisition to which answer is required; (2) furnish the trial court an adequate basis for entry of a proper judgment; and (3) protect the accused from a subsequent prosecution for the same offense. <u>Hammonds</u>, 30 S.W.3d at 299. In <u>State v. Lemacks</u>, 996 S.W.2d 166 (Tenn. 1999), the Court held that an indictment that alleges all of the elements of an offense will not be held insufficient if it fails to allege the specific theory by which the State intends to prove each element. In <u>Lemacks</u>, the defendant was indicted for DUI and the jury was instructed that Lemacks could be found guilty of DUI by finding that he was driving the vehicle while under the influence of an intoxicant or if he was criminally responsible for allowing another party to drive the automobile while under the influence of an intoxicant. <u>Lemacks</u>, 986 S.W.2d at 170-71. The Court noted that criminal responsibility is not a separate, distinct crime but is a theory by which the State may prove the defendant's guilt of the alleged offense. The <u>Lemacks</u> Court continued that criminal responsibility is a codification of the common law theory of aiding and abetting and that any person who aids or abets in the commission of a criminal offense is guilty in the same degree as the principal who committed the crime. <u>Id</u>. at 170-71. Furthermore, it is not necessary that the indictment charge the defendant with criminal responsibility. <u>State v. Johnson</u>, 910 S.W.2d 897, 900 (Tenn. Crim. App. 1995).

We recognize that the indictment was factually in error by alleging that the defendant, rather than Jackson, committed the rape. However, the evidence established that the defendant participated in the rape by aiding and abetting Jackson. The State was entitled to rely upon the theory of criminal responsibility. Accordingly, this issue is without merit.

In the final issue, the defendant asserts that the trial court erred in ruling that the defendant's previous convictions for distributing drugs was admissible for impeachment purposes.

The record reflects that the defendant has two prior felony convictions for delivering a controlled substance. The trial court found that if the defendant testified, the convictions were admissible for impeachment purposes under Tennessee Rules of Evidence 609. The trial court rationalized that there was no relation between drug charges and the crimes for which the defendant was on trial, the crimes were recent, and that there were several State witnesses who had similar convictions.

The defendant argues that the prior drug convictions were not relevant to the issue of credibility and that the unfair prejudicial effect outweighed the probative value of the impeaching convictions because of evidence that the motive for these crimes was a prior drug deal between the victim's boyfriend, the defendant and Andre Jackson.

In State v. Mixon, 983 S.W.2d 661 (Tenn. 1999), our Supreme Court addressed the criteria to be considered in a Rule 609 hearing as follows:

> In determining whether the issue of credibility outweighs its unfair prejudicial effect upon the substantive issues, two criteria are especially relevant. A trial court should first analyze the relevance the impeaching conviction has to the issue of credibility. . . . If the conviction is probative of the defendant's credibility, the trial court should secondly "assess the similarity between the crime on trial and the crime underlying the impeaching conviction."

Mixon, 983 S.W.2d at 674.

In Tennessee, the law as to whether offenses based upon sale or delivery of drugs is relevant to the issue of credibility is about as certain as an election in Florida. Recently, this Court held that the sale of cocaine does not involve dishonesty or false statement as contemplated by Rule 609. State v. Walker, 29 S.W.3d 885, 891 (Tenn. Crim. App. 1999). However, this Court held to the contrary in State v. Brian Roberson, No. 01C01-9801-CC-0043, (Tenn. Crim. App., filed Dec. 21, 1998) and in State v. Gibson, 701 S.W.2d 627, 629 (Tenn. Crim. App. 1985). In State v. Dooley, 29 S.W.3d 542, 554, (Tenn. Crim. App. 2000), this Court recognized that the admission of a prior felony drug conviction is probative to the issue of an accused's credibility and held that the trial court did not abuse its discretion in finding that a prior drug conviction was relevant to the issue of credibility in a second degree murder case. Further, in State v. Toon, 872 S.W.2d 922, 927 (Tenn.

Crim. App. 1993), this Court held that it was within the trial court's discretion to find that felony drug convictions were relevant to the defendant's credibility.

The illegal sale of drugs is an extremely profitable criminal enterprise, and its very nature involves a sustained intent to violate the law and the use of deceptive practices. These crimes are normally not detected in the absence of a police undercover operation. People who deal in drugs frequently suffer an addiction to drugs and commit other crimes to obtain money to buy drugs. These circumstances all involve elements of dishonesty. We find that the better reasoned view is expressed in those cases which hold that felony drug convictions are relevant to the issue of credibility.

Having concluded that these convictions are relevant, it is next necessary to determine whether the prejudicial effect outweighs the probative value of the evidence. The trial court found that the crimes for which the defendant was on trial were dissimilar to his prior convictions and that the prejudicial effect would be diminished because some of the State witnesses had prior convictions. We cannot say that the trial court erred in finding the probative value of the evidence outweighed its prejudice effect.

## Conclusion

In summary, with respect to the jury selection process, we hold: the failure to raise the issue of a Batson violation during jury selection constitutes a waiver of that issue; the failure to swear the jury before voir dire is not reversible error unless it is shown that a juror did not truthfully answer the questions as the result of not being sworn; and the trial court did not abuse its discretion in refusing to dismiss two jurors for cause. Additionally, we hold that felony drug crimes are crimes involving dishonesty and are relevant to the issue of credibility under Rule 609 of the Tennessee Rules of Evidence, and that under the facts of this case, the unfair prejudicial effect did not outweigh the probative value of the impeaching convictions. Finally, we hold that the indictment charging the defendant with aggravated rape was legally sufficient, and that the evidence was sufficient to support the verdict of the jury for that offense.

_____
WILLIAM B. ACREE, JR., SPECIAL JUDGE